**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| EBONI HONORE<br><br>   Plaintiff,<br><br>vs.<br><br>ANGIODYNAMICS, INC. & NAVILYST<br>MEDICAL, INC.,<br><br>   Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES**<br><br>**(1) NEGLIGENCE**<br>**(2) DESIGN DEFECT**<br>**(3) FAILURE TO WARN**<br>**(4) BREACH OF IMPLIED WARRANTY**<br>**(5) BREACH OF EXPRESS WARRANTY**<br>**(6) FRAUDULENT CONCEALMENT**<br>**(7) LOUISIANA PRODUCT LIABILITY**<br>  **ACT (LPLA)**<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

**COMES NOW** Plaintiff EBONI HONORE, by and through the undersigned counsel, and

for her Complaint against AngioDynamics, Inc. and Navilyst Medical, Inc. (collectively, the

"Defendants"), and alleges as follows:

1. This is an action for damages arising out of failures relating to Defendants' design,

development, testing, assembling, manufacturing, packaging, promoting, marketing, distribution,

supplying, and/or selling the defective implantable vascular access device sold under the trade

name of Vortex LP  (hereinafter "Vortex LP" or "Defective Device").

## PARTIES

2.  Plaintiff EBONI HONORE ("Plaintiff" or "EBONI HONORE") is an adult citizen and

resident of New Orleans, Louisiana, and claims damages as set forth below. Plaintiff was

implanted with the Defendants' Vortex LP Product for transfusions for her Sickle Cell Anemia;

– 1 –

Plaintiff sustained serious injuries due to the defective Vortex LP device and due to the Defendants' tortious conduct, as shown below in the main body of this Complaint.

3. Defendant AngioDynamics, Inc. ("AngioDynamics") is a Delaware corporation with its principal place of business located in Latham, New York. AngioDynamics is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the SmartPort.

4. Defendant Navilyst Medical, Inc. ("Navilyst") is a Delaware corporation with its principal place of business located in Marlborough, Massachusetts. Navilyst conducts business throughout the United States, including the State of Louisiana, and is a wholly owned subsidiary of AngioDynamics. Navilyst is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the Vortex LP.

## JURISDICTION AND VENUE

5. The Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and cost.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 by virtue of the facts that (a) a substantial part of the events or omissions giving rise to the claims occurred in this District, and (b) Defendants' products are produced, sold to, and consumed by individuals in the State of Louisiana, thereby subjecting Defendants to personal jurisdiction in this action and

– 2 –

COMPLAINT

making them all "residents" of this judicial District.

7.     Defendants have and continue to conduct substantial business in the State of Louisiana and in this District, distribute vascular access products in this District, receive substantial compensation and profits from sales of vascular access products in this District, and made material omissions and misrepresentations and breaches of warranties in this District, so as to subject them to *in personam* jurisdiction in this District.

8.     Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, this Court has *in personam* jurisdiction over Defendants because Defendants are present in the State of Louisiana, such that requiring an appearance does not offend traditional notices of fair and substantial justice.

## PRODUCT BACKGROUND

9.     Defendants' Vascular Access Devices were designed, patented, manufactured, labeled, marketed, sold, and distributed by the Defendants at all relevant times herein.

10.     The Vortex LP is one of several varieties of port/catheter systems that has been designed, manufactured, marketed, and sold by Defendants.

11.     According to Defendants, the Vortex LP is a totally implantable vascular access device designed to provide repeated access to the vascular system for the delivery of medication, intravenous fluids, parenteral nutrition solutions, and blood products.

12.     The intended purpose of Vortex LP is to make it easier to deliver medications directly into the patient's bloodstream. The device is surgically placed completely under the skin and left implanted.

COMPLAINT

13.    Upon information and belief, the Vortex LP in this case is a system consisting of two primary components: an injection port and a silicone catheter which includes additives intended to make it radiopaque.

14.    The injection port has a raised center, or "septum," where the needle is inserted for delivery of the medication. The medication is carried from the port into the bloodstream through a small, flexible tube, called a catheter, that is inserted into a blood vessel.

15.    The Vortex LP is indicated for patient therapies requiring repeated access to the vascular system. The port system can be used for infusion of medications, I.V. fluids, parenteral nutrition solutions, blood products, and for the withdrawal of blood samples.

16.    Upon information and belief, the product's catheter is comprised of a polymeric mixture of silicone and a barium sulfate radiopacity agent.

17.    Barium sulfate is known to contribute to reduction of the mechanical integrity of silicone *in vivo* as the particles of barium sulfate dissociate from the surface of the catheter over time, leaving microfractures and other alterations of the polymeric structure and degrading the mechanical properties of the silicone.

18.    Researchers have shown that catheter surface degradation in products featuring a radiopaque barium sulfate stripe is concentrated at the locus of the stripe.[1]

19.    The design of the product at issue in this case includes a catheter with a stripe containing a stripe with a higher concentration of barium sulfate than the rest of the catheter.

---

[1] See Shecker JF, Scandrett LA. Roughness and thrombogenicity of the outer surfaces of intravascular catheters. *J Biomed Mater Res*. 1985;19(4):381-395. doi:10.1002/jbm.820190404

COMPLAINT

20. According to relevant medical literature, such design is proven to have a higher rate of fracture than catheters without the barium-loaded stripe.

21. The mechanical integrity of a barium sulfate-impregnated silicone is affected by the concentration of barium sulfate as well as the heterogeneity of the modified polymer.

22. Upon information and belief, Defendants' manufacturing process in designing and constructing the catheter implanted in Plaintiff involved too high a concentration of barium sulfate particles for the polymer formulation, leading to improperly high viscosity of the admixed silicone before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix.

23. This defect in the manufacturing process led to a heterogeneous modified polymer which led to an irregular catheter surface replete with fissures, pits, and cracks as well as sections of the catheter lumen which contain more than 30% barium sulfate by weight, reducing the catheter strength at those loci.

24. The roughened catheter surface leads to the collection and proliferation of fibrinous blood products, thereby drastically increasing the risk of biofilm formation and the subsequent development of infection(s).

25. Although the surface degradation and resultant mechanical failure can be reduced or avoided with design modifications (e.g., using a higher grade radiopacity compound and/or encapsulating the admixed polymer within silicone), Defendants elected not to incorporate those design elements into the Vortex LP.

26. At all times relevant, Defendants misrepresented the safety of the Vortex LP system, and negligently designed, manufactured, prepared, compounded, assembled, processed,

– 5 –

labeled, marketed, distributed, and sold the Vortex LP system as safe and effective device to be surgically implanted to provide repeated access to the vascular system for the delivery of medications, intravenous fluids, parenteral nutrition solutions, and blood products.

27.     At all times relevant to this action, Defendants knew and had reason to know, that the Vortex LP was not safe for the patients for whom they were prescribed and implanted, because once implanted the device was prone to infections, and otherwise malfunctioning.

28.     At all times relevant to this action, Defendants knew and had reason to know that patients implanted with a Vortex LP port had an increased risk of suffering life threatening injuries, including but not limited to: death; infection; hemorrhage; cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart); cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; and perforations of tissue, vessels and organs, or the need for additional surgeries to remove the defective device.

29.     Soon after the Vortex LP was introduced to market, which, upon information and belief, was years before Plaintiff was implanted with her device, Defendants began receiving large numbers of adverse event reports ("AERs") from health care providers reporting the Vortex LP-related infections. These failures were often associated with reports of severe patient injuries such as:

1.   hemorrhage.

2.   infection/sepsis;

3.   cardia/pericardial tamponade;

4.   cardiac arrhythmia and other symptoms similar to myocardial infarction;

5.   severe and persistent pain;

6.    perforations of tissue, vessels and organs; and

7.    upon information and belief, even death.

30.    In addition to the large number of AERs which were known to Defendants and reflected in publicly accessible databases, there are many recorded device failures and/or injuries related to the Defendants' implantable port products which were concealed from medical professionals and patients through submission to the FDA's controversial Alternative Summary Reporting ("ASR") program.

31.    The FDA halted the ASR program after its existence was exposed by a multi-part investigative piece, prompting a widespread outcry from medical professionals and patient advocacy groups.[2]

32.    Prior to the discontinuation of the ASR program, Defendants reported numerous episodes of failures of their implanted port/catheter products – including numerous episodes of infections – under the ASR exemption, thereby concealing them from physicians and patients.

33.    Defendants were aware or should have been aware that the Vortex LP had a substantially higher failure rate than other similar products on the market, yet Defendants failed to warn consumers of this fact.

34.    Defendants also intentionally concealed the severity of complications caused by the Vortex LP and the likelihood of these events occurring.

35.    Rather than alter the design of the Vortex LP to make it safer or adequately warn physicians of the dangers associated with the Vortex LP, Defendants continued to actively and

---

[2] Christina Jewett, *Hidden Harm: Hidden FDA Reports Detail Harm Caused by Scores of Medical Devices*, Kaiser Shealth News (Mar. 2019)

aggressively market the Vortex LP as safe, despite their knowledge of numerous reports of catheter-related infections and associated injuries.

36. Moreover, Defendants concealed—and continue to conceal—their knowledge of the SmartPort dangerous propensity to precipitate infections. Defendants further concealed their knowledge that the catheter design caused these failures and that these failures cause serious injuries.

37. The conduct of Defendants, as alleged in this Complaint, constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of EBONI HONORE. Defendants had actual knowledge of the dangers presented by the Vortex LP System, yet consciously failed to act reasonably to:

  a. Adequately inform or warn Plaintiff, her prescribing physicians, or the public at large of these dangers;

  b. Establish and maintain an adequate quality and post-market surveillance system; or

  c. Recall the Vortex LP System from the market.

**SPECIFIC FACTUAL ALLEGATIONS AS TO PLAINTIFF**

38. On or about August 22, 2022, EBONI HONORE underwent placement of an AngioDynamics' Vortex LP product, UPN H787LVTX52130, LOT number 5400308. Upon information and belief, the Vortex LP device at issue has the following description: Vortex LP Dual Titanium Port System with Attachable 11.4F x 76cm Silicone Catheter.

39. The Vortex LP device at issue was implanted by Dr. Steven D. Jones, MD at Tulane Medical Center, New Orleans, Louisiana, for transfusion treatment for Plaintiff's Sickle

Cell Anemia.

40.    Defendants, directly or through their agents, apparent agents, servants, or employees designed, manufactured, marketed, advertised, distributed, and sold the Vortex LP that was implanted in EBONI HONORE.

41.    Defendant manufactured, sold, and/or distributed the Vortex LP to EBONI HONORE, through her doctors, to be used for vein access.

42.    On or about December 14, 2022, Plaintiff presented to Tulane Medical Center in New Orleans, Louisiana, to be evaluated for pain crisis related to her Sickle Cell Anemia; at that time, EBONI HONORE'S medical team found her to be persistently bacteremic with Staph epidermitis.

43.    At that time, Plaintiff's medical team investigated the possible sources of Plaintiff's persistent bacteremia. The Infectious Disease service became involved in the process of said investigation and it was able to determine that Plaintiff's port, i.e., her Vortex LP port, was the source of her persistent bacteremia with Staph epidermidis.

44.    On December 22, 2022, Plaintiff's infected port, i.e., the source of Plaintiff's persistent bacteremia with Staph epidermidis, was removed by Dr. Sharven Taghavi, MD, at Tulane Medical Center.

45.    At all times, Vortex LP was utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the instructions for use and created procedures for implanting the product.

COMPLAINT

46. The Vortex LP implanted in EBONI HONORE was in the same or substantially similar condition as when it left the possession of Defendants and in the condition directed by and expected by Defendants.

47. EBONI HONORE and her physicians foreseeably used and implanted the Vortex LP and did not misuse or alter the Vortex LP in an unforeseeable manner.

48. Defendants advertised, promoted, marketed, sold, and distributed the Vortex LP as a safe medical device when Defendants knew or should have known the Vortex LP was not safe for its intended purposes and that the product could cause serious medical problems.

49. Defendants had sole access to material facts concerning the defective nature of the Vortex LP product and its propensity to cause serious and dangerous side effects, including, but not limited to the catheter-related infections.

50. In reliance on Defendants' representations, EBONI HONORE's doctors were induced to, and did use the Vortex LP.

51. As a result of having the Vortex LP implanted, EBONI HONORE has experienced significant pain and suffering, has undergone additional surgeries, and has suffered financial or economic loss, including, but to limited to obligations for medical services and expenses.

52. Defendants' Vortex LP was marketed to the medical community and to patients as a safe, effective, reliable, medical devices implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, and as safer and more effective as compared to the traditional products and procedures for treatment and other competing Vascular Access Devices.

53.    The Defendants have marketed and sold the Defendants' Vortex LP to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, direct to consumer advertising, aggressive marketing to health care providers at medical conferences, hospitals, private offices, and/or group purchasing organizations, and include a provision of valuable consideration and benefits to the aforementioned.

54.    The injuries, conditions, and complications suffered due to Defendants' Vortex LP include, but are not limited to, infection; necrosis; fracture and leakage; blood clots; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; perforations of tissue, vessels and organs; and even death.

55.    Defendants were negligent toward EBONI HONORE in the following respects:

a.    Defendant failed to design and establish a safe, effective procedure for removal of Vortex LP; therefore, in the event of a failure, injury, or complications it is difficult to safely remove Vortex LP.

b.    Defendants provided incomplete, insufficient, and misleading information to physicians in order to increase the number of physicians using Vortex LP for the purpose of increasing their sales. By so doing, Defendants caused the dissemination of inadequate and misleading information to patients, including EBONI HONORE.

56.    The Vortex LP was utilized and implanted in a manner foreseeable to Defendants.

57. The Vortex LP implanted into EBONI HONORE was in the same or substantially similar condition as when it left the possession of the Defendants and in the condition directed by the Defendants.

58. At the time of her operation, EBONI HONORE was not informed of, and had no knowledge of the complaints, known complications and risks associated with the Vortex LP, including, but not limited to the extent of seriousness of the danger of the catheter-related infections.

59. EBONI HONORE was never informed by Defendants of the defective and dangerous nature of Vortex LP.

60. At the time of her implant, upon information and belief, neither EBONI HONORE nor her physicians were aware of the defective and dangerous condition of the Vortex LP.

61. As a result of the Defendants' actions and inactions, EBONI HONORE has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

## COUNT I: NEGLIGENCE
(Against Defendants AngioDynamics and Navilyst)

62. Plaintiff incorporates the preceding paragraphs as if set out fully herein.

63. The Defendants owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, selling, and conducting post-market surveillance of the Vortex LP.

64. The Defendants failed to exercise due care under the circumstances and therefore breached this duty by:

    a. Failing to properly and thoroughly test the Vortex LP before releasing the

COMPLAINT

device to market, and/or failing to implement feasible safety improvements;

b.  Failing to properly and thoroughly analyze the data resulting from any pre-market testing of the Vortex LP;

c.  Failing to conduct sufficient post-market testing and surveillance of the Vortex LP;

d.  Failing to comply with state and federal regulations concerning the study, testing, design, development, manufacture, inspection, production, advertisement, marketing, promotion, distribution, and/or sale of the Vortex LP;

e.  Designing, manufacturing, marketing, advertising, distributing, and selling the Vortex LP to consumers, including Plaintiff, without an adequate warning of the significant and dangerous risks of the Vortex LP and without proper instructions to avoid the harm which could foreseeably occur as a result of using the device;

f.  Failing to exercise due care when advertising and promoting the Vortex LP; and

g.  Negligently continuing to manufacture, market, advertise, and distribute the Vortex LP after Defendants knew or should have known of its adverse effects.

65.  As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

66.  In performing the foregoing acts, omissions, and misrepresentations, Defendants

COMPLAINT

acted grossly negligent, fraudulently, and with malice.

## <u>COUNT II: STRICT PRODUCTS LIABILITY – DESIGN DEFECT</u>
(Against Defendants AngioDynamics and Navilyst)

67.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

68.    Defendants supplied, manufactured, sold, distributed and/or otherwise placed into the stream of commerce the Vortex LP implanted into Plaintiff.

69.    The Vortex LP implanted into Plaintiff was not reasonably safe for its intended use and was defective with respect to its design.

70.    The Vortex LP was in a defective condition and was defective in its design in that when it left the possession and control of Defendants, it was not safe for its anticipated use and safer, more reasonable alternative designs existed that could have been utilized by Defendants.

71.    The Vortex LP was unreasonably dangerous to the user or consumer, taking into consideration the utility of said product and the risks involved in its use. The foreseeable risks associated with the design of the product were more dangerous than a reasonably prudent consumer such as Plaintiff and/or her physicians would expect when the product was used for its normal and intended purpose.

72.    The Vortex LP was expected to and did reach the consumer without substantial change in the condition in which it was supplied, distributed, sold and/or otherwise placed into the stream of commerce.

73.    A reasonably prudent medical device manufacturer would have recognized the defective design of the Vortex LP and not placed it into the stream of commerce.

74.    The design defects in the Vortex LP were not known, knowable and/or reasonably

apparent to Plaintiff and/or her physician or discoverable upon any reasonable examination.

75.     The Vortex LP was used and implanted in the manner in which it was intended to be used and implanted by Defendants pursuant to the instructions for use and the product specifications provided by Defendants.

76.     Defendants are strictly liable to Plaintiff for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

77.     As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

78.     In performing the foregoing acts, omissions, and misrepresentations, Defendants acted grossly negligent, fraudulently, and with malice.

### COUNT III: STRICT PRODUCTS LIABILITY – FAILURE TO WARN
(Against Defendants AngioDynamics and Navilyst)

79.     Plaintiff incorporates the preceding paragraphs as if set out fully herein.

80.     Defendants designed, set specifications, manufactured, assembled, processed, marketed, labeled, distributed, and sold the Vortex LP, including the one implanted in Plaintiff, into the stream of commerce and in the course of the same, directly advertised and marketed the device to consumers or  persons responsible for consumers, and therefore had a duty to warn of the risk of harm associated with the use of the device and to provide adequate instructions on the safe and proper use of the device.

81.     At the time Defendants designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the device into the stream of commerce, the device was defective and presented a substantial danger to users of the product

when put to its intended and reasonably anticipated use, namely as an implanted port/catheter system to administer intravenous fluids and/or medications. Defendants failed to adequately warn of the device's known or reasonably scientifically knowable dangerous propensities, and further failed to adequately provide instructions on the safe and proper use of the device.

82.   Defendants knew or should have known at the time they manufactured, labeled, distributed, and sold the Vortex LP that was implanted into Plaintiff that the Vortex LP posed a significant and higher risk than other similar devices of device failure and resulting serious injuries.

83.   Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of the Vortex LP; no reasonable  health care provider, including Plaintiff's, or patient would have used the device in the manner directed, had those facts been made known to the prescribing  healthcare providers or the consumers of the device.

84.   The warnings, labels, and instructions provided by Defendants at all times relevant to the action, are and were inaccurate, intentionally misleading, and misinformed and misrepresented the risks and benefits and lack of safety and efficacy associated with the device.

85.   The health risks associated with the device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

86.   The Vortex LP, which was designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold into the stream of commerce by Defendants, was defective at the time of release into the stream of commerce due to inadequate warnings, labeling and/or instructions accompanying the product.

87.    When Plaintiff was implanted with the device, Defendants failed to provide adequate warnings, instructions, or labels regarding the severity and extent of health risks posed

COMPLAINT

by the device, as discussed herein.

88.     Defendants intentionally underreported the number and nature of adverse events associated with port infections to Plaintiff's health care providers, as well as the FDA.

89.     Upon information and belief, neither Plaintiff nor her health care providers knew of the substantial danger associated with the intended and foreseeable use of the device as described herein.

90.      Plaintiff and her health care providers used the Vortex LP in a normal, customary, intended, and foreseeable manner, namely as a surgically placed device used to make it easier to deliver medications directly into the patient's bloodstream.

91.     Upon information and belief, the defective and dangerous condition of the Vortex LP, including the one implanted into Plaintiff, existed at the time they were manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold by Defendants to distributors and/or healthcare professionals or organizations.

92.     Upon information and belief, the Vortex LP implanted in Plaintiff was in the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed and sold by Defendants.

93.     Defendants' lack of sufficient warnings and/or instructions was the direct and proximate cause of Plaintiff's serious physical injuries and economic damages in an amount to be determined at trial. Had Defendants provided adequate warnings, Plaintiff and her physicians would not have used the Vortex LP.

94.     As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic

damages, both in the past and future, including for pain and suffering and medical expenses.

95.     In performing the foregoing acts, omissions, and misrepresentations, Defendants acted grossly negligent, fraudulently, and with malice.

## COUNT IV: BREACH OF IMPLIED WARRANTY
(Against Defendants AngioDynamics and Navilyst)

96.     Plaintiff incorporates the preceding paragraphs as if set out fully herein.

97.     Defendants impliedly warranted that the Vortex LP was merchantable and fit for the ordinary purposes for which it was intended.

98.     When the Vortex LP was implanted in Plaintiff, it was being used for the ordinary purposes for which it was intended.

99.     Plaintiff, individually and/or by and through her physician, relied upon Defendants' implied warranties of merchantability in consenting to have the Vortex LP implanted in her body.

100.    Privity exists between Plaintiff and the Defendants because Plaintiff's physicians acted as Plaintiff's purchasing agents in the subject transaction and/or because Plaintiff was a third-party beneficiary of the subject contract.

101.    Plaintiff was the intended consumer of the device when Defendants made the warranties set forth herein, and such warranties were made to benefit Plaintiff, as a patient and consumer.

102.    Defendants breached these implied warranties of merchantability because the Vortex LP implanted in Plaintiff was neither merchantable nor suited for its intended uses as warranted in that the device varied from its intended specifications, which included, but are not

limited to variances in the following respects:

a. Defendants' manufacturing process in constructing the catheter of the Vortex LP implanted in Plaintiff involved too high of a concentration of barium sulfate particles for the polymer formulation, which led to improperly high viscosity of the admixed silicone before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix;

b. Defendants knew or should have known barium sulfate is known to contribute to a reduction in the mechanical integrity of the silicone in their product, the Vortex LP, as the barium sulfate particles dissociate from the surface of the catheter over time; and

c. These defects led to a heterogenous modified polymer that included microfractures and weakened areas at the location of the higher barium sulfate concentration that ultimately led to the collection and proliferation of blood products, thereby drastically increasing the risk of development of biofilm and the development of subsequent infections.

103.    Defendants' breaches of their implied warranties resulted in the implantation of an unreasonably dangerous and defective product, the Vortex LP, into Plaintiff's body, placing Plaintiff's health and safety in jeopardy.

104.    The Vortex LP was sold to Plaintiff's health care providers for implantation in patients, such as Plaintiff.

105.    As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic

– 19 –

COMPLAINT

damages, both in the past and future, including for pain and suffering and medical expenses.

106.    Upon information and belief, Plaintiff's health providers sent notice to Defendants of the adverse event that occurred to Plaintiff and thus, the nonconformity of the Vortex LP, within a reasonable period of time following discovery of the breach of warranty and before suit was filed.

## COUNT V: BREACH OF EXPRESS WARRANTY
(Against Defendants AngioDynamics and Navilyst)

107.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

108.    Defendants through their officers, directors, agents, representatives, and written literature and packaging, and written and media advertisement, expressly warranted that the Vortex LP was safe and fit for use by consumers, was of merchantable quality, did not produce dangerous side effects, and was adequately tested and fit for its intended use.

109.    The Vortex LP does not conform to the Defendants' express representations because it is not reasonably safe, has numerous serious side effects, and causes severe and permanent injury.

110.    Defendants further breached express representations and warranties made to Plaintiff, her physicians and healthcare providers with respect to the Vortex LP implanted in Plaintiff in the following respects:

   a.   Defendants represented to Plaintiff and her physicians and healthcare providers through labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions among other ways that the Defendants' Vortex LP was safe, meanwhile Defendants

– 20 –

COMPLAINT

fraudulently withheld and concealed information about the substantial risks of serious injury associated with using Vortex LP;

b. Defendants represented to Plaintiff and her physicians and healthcare providers that the Defendants' Vortex LP was as safe and/or safer than other alternative procedures and devices then on the market, but fraudulently concealed information that demonstrated that Vortex LP was not safer than alternative therapies and products available on the market; and

c. Defendants represented to Plaintiff and her physicians and healthcare providers that the Vortex LP was more efficacious than other alternative procedures, therapies and/or devices. Meanwhile, Defendants fraudulently concealed information regarding the true efficacy of the Vortex LP.

111. At all relevant times, the Vortex LP did not perform as safely as an ordinary consumer would expect, when used as intended or in a reasonably foreseeable manner.

112. Plaintiff, her physicians, and the medical community reasonably relied upon the Defendants' express warranties for the Vortex LP.

113. Privity exists between Plaintiff and the Defendants because Plaintiff's physicians acted as Plaintiff's purchasing agents in the subject transaction and/or because Plaintiff was a third-party beneficiary of the subject contract.

114. Plaintiff was the intended consumer of the Vortex LP when Defendants made the warranties set forth herein, and such warranties were made to benefit Plaintiff, as a patient and consumer.

115. At all relevant times, the Vortex LP was used on Plaintiff by her physicians for the

– 21 –

COMPLAINT

purpose and in the manner intended by Defendants.

116.   Plaintiff and the Plaintiff's physicians, by the use of reasonable care, could not have discovered the breached warranty and realized its danger.

117.   As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

118.   Upon information and belief, Plaintiff's healthcare providers sent notice to Defendants of the adverse event that occurred to Plaintiff and thus, the nonconformity of the Vortex LP, within a reasonable period of time following discovery of the breach of warranty and before suit was filed.

## COUNT VI: FRAUDULENT CONCEALMENT
(Against Defendants AngioDynamics and Navilyst)

119.   Plaintiff incorporates the preceding paragraphs as if set out fully herein.

120.   Defendants made false statements and representations to Plaintiff and her healthcare providers concerning the Vortex LP product implanted in Plaintiff.

121.   Defendants engaged in and fraudulently concealed information with respect to the Vortex LP in the following respects:

a. Defendants represented through the labeling, advertising, marketing materials, seminar presentations, publications, notice letters, and regulatory submissions that the Vortex LP was safe and fraudulently withheld and concealed information about the substantial risks of using the Vortex LP, including, but not limited to, its heightened propensity to precipitate infections, and cause complications;

– 22 –

COMPLAINT

b. Defendants represented that the Vortex LP was safer than other alternative systems and fraudulently concealed information which demonstrated that the Vortex LP was not safer than alternatives available on the market;

c. Defendants concealed that they knew of the Vortex LP's dangerous propensity to precipitate infections and was causing complications from causes other than the manner in which the implanting physician implanted the device; and

d. That frequency of these failures and the severity of injuries were substantially worse than had been reported.

122. Defendants had knowledge that the representations they made concerning the Vortex LP, as stated above, were false.

123. Defendants had sole access to material facts concerning the dangers and unreasonable risks of the Vortex LP.

124. The concealment of information by the Defendants about the risks of the Vortex LP was intentional.

125. The concealment of information and the misrepresentations about the Vortex LP were made by the Defendants with the intent that Plaintiff's health care providers and Plaintiff rely upon them.

126. Plaintiff and her physicians relied upon the representations and were unaware of the substantial risks of the Vortex LP which the Defendants concealed from the public, including Plaintiff and her physicians.

127. As a direct and proximate result of the Defendants' actions, omissions and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic

COMPLAINT

damages, both in the past and future, including for pain and suffering and medical expenses.

128.    The Defendants acted with oppression, fraud, and malice towards Plaintiff.

129.    Had Defendants not concealed this information, neither Plaintiff nor her health care providers would have consented to using the Vortex LP placed in Plaintiff.

## COUNT VII: LOUISIANA PRODUCT LIABILITY ACT
(Against Defendants AngioDynamics and Navilyst)

130.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

131.    Plaintiff, a consumer, purchased the Vortex LP, and the product was intended for Plaintiff's personal use.

132.    The acts and practices engaged in by Defendants as outlined above constitute unlawful, unfair, and/or fraudulent business practices in violation of the Louisiana Products Liability Act (LPLA), RS 9:2800.51, *et seq*. Acts 1988, No. 64, §1, eff. Sept.1, 1988.

133.    Defendants engaged in unlawful practices including deception, false promises, misrepresentation, and/or the concealment, suppression, or omission of material facts in connection with the sale, distribution, and/or advertisement of the Vortex LP in violation of LPLA.

134.    Plaintiff purchased the Vortex LP, a product that was falsely represented, as further set forth herein, as having certain characteristics and benefits it did not have, *inter alia*, that it was reasonably safe for use, as further set forth above, in violation of the LPLA.

135.    Defendants further knowingly or recklessly engaged in unfair, unconscionable, deceptive, deliberately misleading, false, and/or fraudulent and deceptive acts and practices, all in violation of the LPLA, and as further described herein, which created a likelihood of confusion or misunderstanding on Plaintiff's  part with respect to the Vortex LP she purchased, including, but

not limited to, misrepresenting that the Vortex LP was reasonably safe for use and failing to adequately disclose the substantial risk of infections, and harm the product entailed given the large number of adverse events Defendants knew or should have been aware of but did not adequately disclose to Plaintiff.

136. Defendants' practices were likely to mislead consumers who acted reasonably to their detriment in purchasing the product based on Defendants' representations that it was reasonably safe for use when it in fact was not and had a higher risk of infections due to its defective design.

137. Defendants intended for Plaintiff, Plaintiff's physicians, and other consumers to rely on their deceptive practices and representations in order to continue selling and manufacturing the Vortex LP.

138. As a result of Defendants' conduct, Plaintiff suffered economic damages in that the product purchased was misrepresented to be reasonably safe for use and was worth far less than the product Plaintiff thought she had purchased had Defendants' representations been true.

## PRAYER

**WHEREFORE**, Plaintiff prays for judgment against each of the Defendants as follows:

a. Judgment be entered against all Defendants on all causes of action of this Complaint;

b. Plaintiff be awarded her full, fair, and complete recovery for all claims and causes of action relevant to this action;

c. Plaintiff be awarded general damages according to proof at the time of trial;

d. Plaintiff be awarded damages, including past, present, and future medical expenses according to proof at the time of trial;

COMPLAINT

e.   Plaintiff be awarded costs and attorney's fees in connection with Plaintiff's Louisiana Products Liability Act (LPLA), claim under RS 9:2800.51, *et seq.*  Acts 1988, No. 64, §1, eff. Sept.1, 1988.

f.   Awarding pre-judgment and post-judgment interest to Plaintiff;

g.   Awarding the costs and the expenses of this litigation to Plaintiff;

h.   For such other and further relief as the court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues.

Respectfully submitted,

**BEY AND ASSOCIATES**

 */s/ Jennifer Greene*
Jennifer Greene LA# 30899
650 Poydras Street, Suite 2610
New Orleans, Louisiana 70130
Phone: (504) 608-5277
Email: jgreene@beyandassociates.com

**Roman Balaban and Associates, LLC**

*/s/ Roman Balaban*
Roman Balaban (CO # 39148/*Pro Hac Vice*
Application is forthcoming)
Max Yefimenko (CO # 34796/*Pro Hac Vice*
Application is forthcoming)
**Roman Balaban and Associates, LLC**
7350 East Progress Place, Suite 106
Greenwood Village, CO 80111
Phone: 720-817-4040
Fax: 303-500-1713
Email: balaban@rbatort.com
Email: yefimenko@rbatort.com

***ATTORNEYS FOR PLAINTIFF***

– 26 –

COMPLAINT